IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID REES,                                    :
                                               :
     *Plaintiff*,                            :
                                               :     Case No. 1:19-cv-828
v.                                             :
                                               :     Judge Jeffery P. Hopkins
NEWCOMER FUNERAL SERVICE                       :
GROUP, INC.,                                   :
                                               :
     *Defendant*.                            :

## OPINION & ORDER

Meet Plaintiff David Rees ("Plaintiff" or "Rees"): a former Area Manager for Defendant Newcomer Funeral Service Group, Inc. ("Defendant" or "Newcomer"). Rees suffers from diabetes and a heart condition. While he was employed by Newcomer, he required time-off to treat his heart condition. But Rees alleges that after he took necessary leave, Newcomer terminated him. Newcomer resists this narrative and points instead to performance deficiencies, staff complaints, and Rees's failure to participate in a performance plan. Newcomer now seeks summary judgment on all of Rees's claims.

## I.  BACKGROUND

Plaintiff David Rees has spent his entire career in the funeral service industry. Rees received an associate's degree in applied science in 1985, then began an apprenticeship with Linneman Funeral Homes in Northern Kentucky. Rees Dep., Doc. 34, 15:16–16:3; 18:22–19:18. Following his apprenticeship, Rees worked at several other funeral businesses in the greater Cincinnati area—each time leaving for better career opportunities. *Id.* at 18:22–19:9; 22:6–17. Before landing at Newcomer, Rees worked at Spring Grove for about 13 years. *Id.*

at 18:19–21. He began there as a Funeral Director and Embalmer before being promoted to Director of Operations. *Id.* at 22:10–21. Rees left Spring Grove for the Area Manager opportunity at Newcomer. He began employment at Newcomer on February 2, 2015, and remained so employed until Newcomer terminated his employment July 6, 2018. *Id.* at 40:4–7; 125:14–25.

*Performance.* By all accounts, Rees was a valued employee at Newcomer for the majority of his employment. Newcomer noted his contributions in two performance evaluations. Rees's supervisor, Cressa Chalmers, completed both evaluations. Doc. 34-1, Exs. 17, 18. The evaluations reflected seventeen rating areas and provided for three rating options: (1) on target, (2) above and beyond, and (3) improvement opportunity. *Id.* An "on target" rating meant that "performance consistently met expectations in the key competency, at times going above what was expected, and the quality of work overall was excellent and met the high standards expected of the Newcomer Group." *Id.* An "above and beyond" rating meant that "performance regularly far exceeded Newcomer Group expectations due to exceptionally high quality of work performed and regularly went above and beyond job requirements in the key competency, resulting in an overall quality of work that was far superior." *Id.* The last rating, "improvement opportunity," meant that "performance was inconsistent and/or requires some additional focus, many times requiring more than normal supervision." *Id.*

Rees's first evaluation occurred on January 26, 2017. Chalmers identified three of Rees's strengths: excellent communication skills, professionalism, and leadership. Doc. 34-1, Ex. 18, PageID 350–56. She rated Rees as "on target" in twelve rating areas and "above and beyond" in the remaining five areas. *Id.* She did not identify any rating area as an "improvement opportunity." *Id.* Chalmers elaborated on some of these ratings and also noted

that Rees could improve by "[continuing] [his] efforts in outreach and [focusing] on opportunities for new relationships with organizations near [Newcomer] funeral homes." *Id.*

Rees's second evaluation occurred on February 14, 2018. Similar to his previous evaluation, Chalmers identified that Rees's strengths were: (1) leadership with his team and peers, (2) professionalism and accountability, and (3) personal drive for excellence. Doc. 34-1, Ex. 17, PageID 343–49. Chalmers rated Rees as being "on target" in fourteen areas and as "above and beyond" in three areas—two less "above and beyond" ratings than his previous evaluation. *Id.* Chalmers noted, in relevant part:

> *Delegates*: While I feel you do a great job of managing roles and responsibilities, I am concerned that we are delegating too much to Jennifer. She has expressed her concerns and I would like to see the delegation of new tasks and/or current task [*sic*] shared equally about the administrative or funeral directing team.

> *Team Building*: This has been a challenging year for your team. You have had to address several issues with your team as a whole. This is an area of focus for 2018. There seems to be a fracturing on several levels that will need to be repaired and tended to, to get the team back on track.

*Id.* In this evaluation, Chalmers also made two development recommendations. The first pertained to supporting the team in Northern Kentucky, while the second challenged Rees "to do more outreach in both Cincinnati and Northern Kentucky" to grow the business. *Id.* On that front, Chalmers explained that Rees is "ultimately responsible for the outreach." *Id.*

*Staff Complaints.* Notwithstanding his largely positive performance evaluations, staff members began complaining to management about Rees in November 2017. One of those individuals was Andrea Barr. Barr, who reported directly to Rees, testified that she and Melanie Fallon went to Chalmers in November 2017 to express concerns about Rees. Barr Dep., Doc. 33, 35:19–23. Barr reported to Chalmers that she felt like she was being bullied and like she had no support in her role. She expressed concerns about Rees's temper and his

3

practice of taking away days off. *Id.* at 37:14–38:2. Barr stated that she also had issues with her FMLA leave because Rees "would get rather angry and express that [she] was making things difficult for him and for the rest of the team" when she took leave. *Id.* at 42:8–22. Barr recalled that, during the November 2017 meeting, Fallon told Chalmers that she had concerns about doing work outside her job duties. *Id.* at 38:3–10. Barr also testified that Joyce Jones, one of her supervisees, came to her with complaints about Rees. *Id.* at 39:17–21.

Most complaints went to Chalmers but she was not the only person who entertained complaints about Rees. *See, e.g.*, Chalmers Dep., Doc. 37, 34:10–22; 69:22–70:22. Constance Brown, a chief human resources officer at Newcomer, was also on the receiving end. She testified that Barr pulled her aside on at least one occasion to express frustrations about Rees. Brown Dep., Doc. 36, 21:5–14. She also stated that another employee, Jennifer Berger, came to her with concerns about Rees. *Id.* at 21:15–17. Barr and Berger reported to Brown concerns about how Rees was managing work and the staff, how he was handling Barr's FMLA leave, and how he was asking employees to manage work that they considered to be outside the scope of their duties. *Id.* at 23:2–25. Brown reported these concerns to Chalmers and Beverly Lawson, another human resources employee. *Id.* at 21:5–22; 24:25–25:10. Lawson testified that Chalmers also told her about the complaints and said that she "too, had difficulty at times finding [Rees] in the market." Lawson Dep., Doc. 39, 41:22–42:3; 44:8–20. Lawson considered this a performance concern because his lacking presence meant Rees was not "overseeing [his] team and managing the day-to-day." *Id.* at 47:6–25. Lawson passed along her concerns to Chalmers and Brown. *Id.* These complaints were reduced to written statements at the request of Chalmers and human resources. Barr Dep., Doc. 33, 17:3–8; Berger Dep., Doc. 35, 15:4–13; Compl., Doc. 1, ¶ 43; Doc. 36-1, PageID 497.

*Rees's Hospitalization.* Not long after the complaints started, Rees required medical treatment for a heart issue after he began experiencing chest pain in June 2018. Rees Dep., Doc. 34, 91:9–17. This, however, was not a brand new occurrence for Rees. Rees had previously undergone coronary bypass surgery following a heart attack that occurred prior to his employment at Newcomer. *Id.* at 89:3–14. Rees testified that he had prior discussions with Chalmers about the procedures that he had undergone previously. *Id.* at 88:19–24. He estimated that these discussions mostly took place over lunch on three or four occasions throughout the course of his employment at Newcomer. *Id.* at 90:2–8; 16–21. Rees never specifically requested any form of disability from Newcomer. *Id.* at 90:9–15.

When his new symptoms presented on June 11, 2018, he was admitted to the hospital for a multi-day stay until June 14, 2018. Doc. 34-1, Ex. 20, PageID 359. He was absent from work on those days. Rees soon had a discussion with Beverly Lawson. During that conversation, Rees told Lawson that he did not want to use FMLA leave and would prefer to use PTO because he had plenty of it left. Rees Dep., Doc. 34, 92:19–93:18. Rees testified that he hesitated to use FMLA due to comments that supervisor Perry Hasselback had made to Rees in regard to Berger using FMLA leave for a disability. *Id.* at 62:12–25. Rees felt that using FMLA might hamper advancement opportunities at Newcomer. *Id.* at 92:19–93:18. He did not vocalize the specifics of his concern to Lawson but ultimately applied for FMLA at Lawson's insistence. *Id.* at 93:2–10. Following that conversation, Rees took the required documentation to his physician and his physician completed a Certification of Health Care Provider for Employee's Serious Health Condition form—approving FMLA leave from June 13 through June 15, 2018, and also ongoing intermittent time off for up to six times per month for four to six days. *See* Doc. 34-1, Exs. 20, 21.

5

*The July 3 and July 6, 2018, Meetings.* Soon after his hospitalization, on July 3, 2018, Cressa Chalmers met with Rees to discuss his performance. Chalmers testified that they discussed "several performance concerns, specifically his lack of support of his team, his inability to effectively perform the responsibilities that were required of him, complaints of retaliatory behavior, complaints of lack of support [and] complaints of lack of training." Chalmers Dep., Doc. 37, 20:3–14. Chalmers referred to specific examples such as an inability to train, over-delegation, concerns over the schedule, and complaints of retaliatory and angry behavior. *Id.* at 21:19–22:6. Chalmers requested that Rees, in writing, "put together a plan of how he would re-engage, how he would better support his team, and how he would rebuild trust." *Id.* at 29:12–24. She found the issues to be "serious in nature" and cited "numerous conversations prior to this meeting where no improvements had been made." *Id.* at 30:3–7.

Also at that meeting, Chalmers asked Rees if there was anything else going on with him that she should know about. Rees Dep., Doc. 34, 111:15–112:18. Rees said that "all kinds of red flags" were going off inside his head, but he wanted to be forthcoming to an extent. Rees then informed Chalmers that he had been having issues with Type II Diabetes, and that he was working through those issues with his family physician. *Id.* He described Chalmers' response as "rather giddy and excited," but he assured her that he thought it would "all come out fine." *Id.* at 112:8–16. They agreed to meet again a few days later to discuss the performance plan. *Id.* at 112:17–18.

Three days later, the pair reconvened for a brief meeting. Shortly after the meeting commenced on July 6, 2018, Chalmers informed Rees that he was being terminated and presented him with termination paperwork. Chalmers Dep., Doc. 37, 15:6–18; 17:21–18:4; Rees Dep., Doc. 34, 124:2–125:8. Rees alleges that he did not have an opportunity to discuss

6

his performance plan, which he believed was to be presented verbally as opposed to in writing. Rees Dep., Doc. 34, 124:2–125:8; Rees Decl., Doc. 46-1, ¶ 10. Newcomer officially terminated him on that date. *Id.* at 123:18–124:14. Following his termination, Rees filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and later received a Notice of Right to Sue. Compl., Doc. 1, ¶¶ 43–45. Rees commenced this lawsuit on September 30, 2019.[1]

## II.    STANDARD OF REVIEW

To prevail on a motion for summary judgment, Newcomer must show "that there is no genuine dispute as to any material fact and [that it is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden then shifts to the non-movant, Rees, to point to evidence that presents a sufficient factual dispute that "would necessitate submission to a jury." *Hentze v. CSX Transp.., Inc.*, 477 F. Supp. 3d 644, 658 (S.D. Ohio 2020). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

At this stage, the court must view all evidence in the light most favorable to the non-movant and decide "whether the evidence presents a sufficient disagreement to require

---

[1]  Upon the appointment of the Hon. Jeffery P. Hopkins on December 16, 2022, this case was reassigned for all further proceedings from the Hon. Matthew W. McFarland in an order signed by then Chief Judge Algenon L. Marbley on December 21, 2022. The instant motion was one among more than two hundred others pending in civil cases reassigned to the undersigned. Doc. 57.

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52*; see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## III.   LAW AND ANALYSIS

Rees raises five claims. He asserts disability and age discrimination claims under the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the Ohio Revised Code § 4112.01. Beyond those claims, he also alleges that Newcomer retaliated against him after he took leave under the Family and Medical Leave Act ("FMLA"). Compl., Doc. 1, ¶¶ 49–58. Newcomer seeks summary judgment on all of Rees's claims. *See* Doc. 42. Rees does not oppose Newcomer's motion as to his ADEA age discrimination claim (Count IV), but adamantly opposes the remainder of Newcomer's motion. *See* Doc. 49, PageID 1176 n.1. The Court will address each claim herein.

### A.   Disability Discrimination (Counts I, II, III)

The ADA provides that it is unlawful to discriminate against a qualified individual in the terms and conditions of employment based on that individual's disability. 42 U.S.C. § 12112(a). The analogous Ohio statute similarly prohibits discrimination by an employer on the basis of disability. *See* O.R.C. § 4112.01, *et seq.* The parallels between these statutes lend to addressing the claimed violations together, so the Court will do so here. *See Clark v. City of Dublin*, 178 F. App'x 522, 525 (6th Cir. 2006) (collecting cases); *Hoffman v. Fid. Brokerage Servs., Inc.*, 959 F. Supp. 452, 457 n.1 (S.D. Ohio 1997) (concluding that, because the essential elements of claims under the ADA and O.R.C. § 4112 are the same, case law pertaining to

claims brought pursuant to the ADA applies equally to claims brought under the Ohio discrimination statute); *Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 573 (1998).

To defeat summary judgment on a disability-based termination claim, a plaintiff must present direct or indirect (*i.e.*, circumstantial) evidence that would allow a trier of fact to find that the defendant intentionally discriminated against the plaintiff because of his disability. *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). "Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by unlawful discrimination." *Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). Rees offers no direct evidence here.

Because there is no direct evidence of discrimination, this Court will analyze Rees's claims using the *McDonnell Douglas* burden-shifting framework. *See Talley*, 542 F.3d at 1105; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That framework requires Rees to first establish a prima facie case of discrimination. *Talley*, 542 F.3d at 1105. If he successfully establishes a prima facie case, the burden shifts to Newcomer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (quoting *McDonnell Douglas*, 411 U.S. at 802). If Newcomer succeeds in doing so, the burden shifts back to Rees to show that the proffered reason was not the true reason for Rees's termination, but merely a pretext for discrimination. *Talley*, 542 F.3d at 1105.

To establish a prima facie case of disability discrimination under the ADA, Rees must show "(1) that [] he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability." *Id.* (quoting *Mahon v. Crowell*, 295 F.3d

9

585, 589 (6th Cir. 2002)). For purposes of summary judgment, Newcomer does not contest that Rees can establish a prima facie case.[2] *See* Doc. 42, PageID 842. The Court will therefore focus its efforts on the second and third prongs of the *McDonnell Douglas* framework.

*Legitimate Non-Discriminatory Reason*. The second prong requires this Court to evaluate Newcomer's nondiscriminatory reasons for Rees's termination. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (explaining the employer satisfies its burden if it explains its actions or produces evidence of legitimate nondiscriminatory reasons)).

Newcomer has offered legitimate, nondiscriminatory reasons for Rees's termination. Newcomer alleges that it terminated Rees due to performance deficiencies, complaints from staff, and Rees's failure to address performance deficiencies with a plan of improvement as directed by Rees's direct supervisor, Cressa Chalmers. Doc. 42, PageID 843. In support of its decision, Newcomer refers to Rees's "refusal to allow employees to take time off, improper delegation of tasks, his inability to use the relevant technology, his temper, and overall feelings of bullying and retaliation" by supervisees. *Id.* Newcomer has therefore met its burden by producing legitimate, non-discriminatory reasons for Rees's termination. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment."); *Messenheimer v. Coastal*

---

[2] Whether an individual is qualified under the ADA is typically a threshold inquiry. *See Talley*, 542 F.3d at 1005–06. An individual is "qualified" under the ADA if that person "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Here, neither party contests Rees's status as a qualified individual under the ADA. Thus, the Court will assume that Rees is a qualified individual for purposes of its analysis.

*Pet Prods.*, 764 F. App'x 517, 520 (6th Cir. 2019) (finding poor demeanor toward supervisees is a legitimate, nondiscriminatory reason for an adverse employment action).

*Pretext*. Because Newcomer has given legitimate, non-discriminatory reasons for Rees's termination, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)). "A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: 1) by showing that the reason has no basis in fact; 2) by showing that the reason did not actually motivate the employer's action; or 3) by showing that the reason was insufficient to motivate the action." *Macy*, 484 F.3d at 366 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Rees relies heavily—though not exclusively—on the temporal proximity between his FMLA leave and his termination in an attempt to show that his performance did not motivate Newcomer to terminate him. The record does show that Rees's disabling condition prompted a hospital visit that lasted from June 11, 2018, through June 14, 2018. Rees Dep., Doc. 34, 34:24–35:9. And that shortly after his return to work, Chalmers summoned Rees to discuss staff complaints and his performance. Rees recalls that during that meeting Chalmers elicited additional information about Rees's disabling conditions. Then, three days later, Newcomer terminated Rees.

"[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012); *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) ("Unlike its role in establishing a

prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'") (quoting *Sybra, Inc.*, 667 F.3d at 763). Instead, the Court may view temporal proximity as a "strong indicator of pretext when accompanied by some other, independent evidence." *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005). Thus, Rees cannot prevail by relying on temporal proximity alone.

With this in mind, the Court turns to Newcomer's concerns about Rees's performance. Newcomer says that its "position is, and always has been, that [Rees] was terminated due to ongoing performance concerns." Doc. 42, PageID 843. Rees rebuts Newcomer's claims by arguing that such claims are based on falsehoods—or, in other words, that Newcomer's claims are not based on facts. To the contrary: Newcomer's concerns about Rees's performance do have a basis in fact. While reasonable minds can agree that Rees's performance reviews were mostly positive, this does not mean that his performance was without exception. There were several key issues that Chalmers raised in Rees's February 2018 performance review. For instance, Chalmers was concerned about Rees "delegating too much to [Berger]," and remarked that Rees's team was "fracturing on several levels" and he needed to get the team "back on track." Doc. 34-1, Ex. 17, PageID 347. Chalmers testified that the "fracturing" related to "a general dissatisfaction and general mistrust" as reported by his team. Chalmers Dep., Doc. 37, 50:20–51:5. In the evaluation, Chalmers also identified areas of development. She advised Rees to support the team in Northern Kentucky, and "to do more outreach in both Cincinnati and Northern Kentucky" to grow the business. Doc. 34-1, Ex. 17, PageID 348. On the latter point, Chalmers reminded Rees that he is "ultimately responsible for the outreach." *Id.* These concerns predated Rees's medical leave and the adverse employment action by several months. *See* Doc. 34-1, Ex. 21, PageID 361.

Testimony from other employees supports Newcomer's claim that Rees had certain performance deficiencies. Take first for example, the testimony of John Hasselback, Newcomer's executive vice-president and chief operating officer. Hasselback testified that Chalmers shared concerns about Rees's team and his lack of leadership in the market. Hasselback Dep., Doc. 38, 22:23–23:3. Constance Brown, the former vice president of human resources at Newcomer who had worked with Rees before she voluntarily left to take a part-time job at a bank, testified that she too had discussed concerns and frustrations about Rees with Chalmers. Brown Dep., Doc. 36, 18:17–25. Brown also testified that employees like Barr and Berger had reported concerns about Rees to her before he was terminated. *Id.* at 21:4–22. The testimony of Beverly Lawson, one of Newcomer's senior business partners, was consistent with Hasselback and Brown. She had worked with Rees regarding various HR matters throughout his tenure and testified that months before Rees's FMLA leave and termination, Chalmers reported certain deficiencies to her, such as Rees's absence in the market, concerns about his associates' ability to contact him, and his lack of accessibility and support. Lawson Dep., Doc. 39, 17:14–18:6; 41:9–16. Lawson also had her own concerns about Rees being hard to reach and noted his absences were more obvious in the six months preceding his termination. *Id.* at 44:8–47:25. Lawson also shared her concerns about Rees's performance with Brown and Chalmers. *Id.* All of these facts establish that Newcomer had legitimate concerns about Rees's ability to manage his team and fulfill his duties. *See Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (citing *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)) ("Employers are entitled to 'greater flexibility' in management-level employment decisions.").

13

Rees's assertions to the contrary fall short of establishing a genuine dispute of material fact about his performance. Rees testified that he did not know that members of his team were unhappy, though he recalled a conversation with Chalmers about over-delegating to Berger. Rees Dep., Doc. 34, 73:10–14; 70:5–14. As for outreach and growing the business, Rees acknowledged that he, Hasselback, and Chalmers had talked about that together "many, many times," but disputed that this was a legitimate performance concern. *Id.* at 83:8–13. Rees admitted it was "always an ongoing discussion," but said that Hasselback and Chalmers did not set quantifiable expectations. *Id.* at 85:23–86:15.

When considering the totality of the evidence related to Rees's performance in a light most favorable to him, Rees has failed to show that Newcomer's concerns had no basis in fact. Although Rees was a good employee for much of his time at Newcomer, the evidence shows that Newcomer recognized and cited deficiencies in his performance several months before his disabling conditions were a factor. *See, e.g.*, *Henderson v. Chrysler Grp., LLC*, No. 12–10277, 2014 WL 3527070, at *19 (E.D. Mich. July 16, 2014) ("Plaintiff cannot evidence pretext where [] complaints [] regarding her performance and absenteeism predated [her] rheumatoid arthritis diagnosis and her medical leave in 2011."), *aff'd,* 610 F. App'x 488 (6th Cir. 2015). Rees admits that he mentioned his prior heart issues to Chalmers informally over lunch on a few occasions throughout his four-year tenure at Newcomer, but he cannot identify when he did so. And Rees does not allege that the timing of his comments to Chalmers coincided with (or impacted) his February 2018 performance review where Chalmers listed some concerns that led to his termination. Rees Dep., Doc. 34, 88:14–90:24. Thus, even considering the temporal proximity between his leave and termination, Rees has not identified

a genuine dispute that overcomes the uncontroverted evidence that Newcomer's performance concerns were independent of Rees's disabling conditions and medical leave.

But Rees does not give up that easily. Instead, Rees alleges that Newcomer's reliance on his performance is merely pretext because Chalmers did not engage in progressive discipline or allow him to present the performance plan that she requested. Rees also alleges that Chalmers came to the July 6, 2018, meeting with the intention to terminate him rather than discuss the performance plan or ways to move forward. To start, Newcomer's corrective action policy (the "Policy") did not require progressive discipline. Rees Dep., Doc. 34-1, Ex. 13, PageID 334. The Policy provided that managers may take necessary corrective action, commensurate with the severity of the violation, including verbal warnings, written warnings, suspension, *or termination*. *Id.* The Policy also stated

> Although Newcomer Funeral Service Group will often attempt to provide the associate warnings that their conduct or job performance must be improved. [*sic*] In some situations the company may, with no warning, terminate an employee based upon either the belief of Newcomer Funeral Service Group that the seriousness of the conduct/performance justified dismissal without warning, or the belief of Newcomer Funeral Service Group that a warning was not likely to remedy the problem.

*Id.* Hasselbeck testified that the Policy does not require that management give employees progressive discipline before termination. Hasselbeck Dep., Doc. 38, 55:11–15. Rees also acknowledged that Newcomer did not have a set progressive discipline policy and testified that "each circumstance was evaluated on its own." Rees Dep., Doc. 34, 54:8–24.

Further, while there is a dispute between Chalmers and Rees about the July 6, 2018, meeting, the adequacy of the performance plan and whether the plan was to be delivered orally or in writing, Rees has not shown that these disputes are material. Chalmers testified that she had "made the decision that he wasn't performing" before that meeting and was

15

"prepared to move forward with [his] termination." Chalmers Dep., Doc. 37, 31:10–17; 31:23–32:8. Though she admits that she was "prepared to listen should [he] have had a plan for how he wanted to move forward," Chalmers had taken steps to effectuate Rees's termination before the July 6, 2018, meeting. Chalmers Dep., Doc. 37, 31:10–17; Doc. 37-1, PageID 614–15. Rees has thus not shown that the disputed events on July 6, 2018, are material.

The last item to consider are staff complaints made against Rees. Rees argues that the staff complaints that Newcomer relies on amount to no more than misrepresentations that support "a reasonable inference [that] [Chalmers] was looking to create 'evidence' to explain away a termination based on unlawful considerations, i.e., 'disability' and FMLA leave." Doc. 49, PageID 1187. The evidence does not favor Rees's claim. Newcomer began receiving complaints about Rees in November 2017. Chalmers, for example, testified that staff members under Rees's supervision, Fallon, Barr, and Berger reported to her that Rees was "quick to anger." Chalmers Dep., Doc. 37, 34:18–22. Barr's testimony corroborates this. Barr testified that she and Fallon went to Chalmers in November 2017 to complain about Rees. Among a variety of other complaints, Barr told Chalmers that Rees had a temper and anger issues, and that she felt like she was being bullied. Barr Dep., Doc. 33, 37:14–24; 39:5–11; 42:18–22.

But did these complaints concern Chalmers at the time? Arguably not. Chalmers proceeded to applaud Rees for his professionalism only a few months later. In February 2018, Chalmers praised Rees's professionalism—calling it one of his "greatest strengths." Rees Dep., Doc. 34-1, Ex. 17, PageID 343–49. She went as far to say in Rees's 2018 evaluation that he was the "quintessential professional" in all that he did with his team, that he

16

communicated with professionalism, and that she could always rely on Rees "to do the right thing." *Id.*

But after that review, Chalmers personally experienced Rees lose his temper. Chalmers testified about a conversation in April 2018 where she and Rees discussed concerns about long staff hours after another employee made a complaint. Chalmers reported that Rees "became angry," prompting Chalmers to end the conversation so they could "talk when he had an opportunity to be able to behave in a more professional manner." Chalmers Dep., Doc. 37, 52:22–53:11. Rees recalled the conversation with Chalmers and that Chalmers told him to "sleep on it" but disagreed with Chalmer's characterizations about his demeanor. Rees Dep., Doc., 34, 120:5–19; 122:10–123:10. Rees, however, emailed Chalmers the next day explaining that he "wasn't trying to come off as defensive yesterday when we had this conversation." Doc. 39-1, PageID 782.

The complaints do not end there. Though the timing is unclear, other staff members, including Joyce Jones, Jennifer Berger, Greg Jackson, and Melanie Fallon, made similar complaints about Rees to Chalmers and Brown before Rees's termination. Brown Dep., Doc. 36, 21:4–22; Chalmers Dep., Doc. 37, 67:21–25; *cf. Anagonye v. Transform Auto., LLC*, No. 24-1160, 2025 U.S. App. LEXIS 11992, at *5 (6th Cir. May 16, 2025) (finding that an employer's proffered reason for termination in a sex discrimination case had a basis in fact where multiple employees substantiated complaints about the plaintiff's harassing behavior). These employees also provided written statements. Chalmers testified that at her request, each of the individuals that she met with about Rees provided her with a document at the end of June 2018 (so before Rees's termination) that summarized or detailed their concerns about Rees. Chalmers Dep., Doc. 37, 77:16–78:2; 78:24–79:4. However, this timing is contradicted by

Rees, and as he alleges, the evidence shows that these summary documents were not prepared by these individuals until well after Rees was terminated. Barr Dep., Doc. 33, 16:25–17:2; Berger Dep., Doc. 35, 15:4–13; Compl., Doc. 1, ¶ 43; Doc. 36-1, PageID 497. That said, the timing of these statements is not as damning as Rees attempts to argue because the evidence establishes that Newcomer employees began complaining about Rees months before the events that precipitated his medical leave and his termination. Further, the essence of many of the staff complaints was captured in Rees's February 2018 performance evaluation.

There is ample evidence that Rees has failed to rebut related to employee complaints communicated to various individuals at Newcomer prior to his disabling conditions coming into focus. While he may dispute the nature or accuracy of the complaints, Rees has not demonstrated that the staff complaints that Newcomer relies on were merely an attempt to explain away his termination. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 329 (6th Cir. 2021) (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020)) ("[A]n 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'"). And in the end, even if there were a genuine dispute about whether Newcomer's reliance on staff complaints was merely pretext for disability discrimination, it would not change the outcome given that there is no genuine dispute that Newcomer's performance concerns were not pretext. *See Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 477–78 (6th Cir. 2012) ("When an employer offers more than one independent, legitimate, non-discriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment."); *see also Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 552–53 (6th Cir. 2025).

18

Rees has not demonstrated that a genuine dispute exists relative to Newcomer's reasons for his termination. Newcomer is entitled to summary judgment on Rees's disability discrimination claims (Counts I, II, and III) under the ADA and O.R.C. § 4112.

### B.    Age Discrimination (Count IV)

Along with his disability discrimination claims, Rees also asserts a claim for age discrimination. That said, Rees does not oppose Newcomer's motion for summary judgment as to his age discrimination claim and has instead elected to focus on his other claims. Doc. 49, PageID 1176. Rees has thus effectively abandoned his age discrimination claim. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited.") (citations omitted). Even so, undertaking an independent review of Rees's age discrimination claim consistent with Fed. R. Civ. P. 56, the Court finds that Rees cannot establish a prime facie case of age discrimination. *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) ("[E]ven where a motion for summary judgment is unopposed, a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists.").

To establish a prima facie case of age discrimination, Rees must show: (1) he is a member of a protected class; (2) he was qualified for the job in question; (3) an adverse employment action was taken against him; and (4) "circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (internal quotations omitted). Rees cannot establish a prima facie case because, even assuming that he satisfies the first three prongs, he has not offered facts showing an inference of discrimination.

The heart of Rees's age discrimination claim is that he was replaced by Mark Ratliff, who is "substantially younger" than him. Compl., Doc. 1, ¶¶ 36, 37. The law is clear that "[a]n allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant." *Blizzard*, 698 F.3d at 283. Here, the age difference was eight years. An "age difference of ten or more years is generally considered significant," but as here, when there is an age difference in the range of six to ten years, the age difference must be considered on a case-by-case basis. *Id.* at 284. There are insufficient facts to find an inference of discrimination. Rees's replacement, though younger, had substantial experience in the funeral service industry and had previously worked at Newcomer. Ratliff Dep., Doc. 40, 20:15–23; 10:12–13:17. Considering these facts, there is no evidence—let alone a genuine dispute—that Rees's age was a motivating factor in his termination. As a result, Newcomer is entitled to summary judgment on the age discrimination claim (Count IV).

## C.     Retaliation and the Family and Medical Leave Act (Count V)

There are two theories of recovery under the FMLA: interference and retaliation. Rees's final claim is rooted in the latter. To establish a claim for retaliation for exercising his FMLA rights, Rees must demonstrate that: (1) he was engaged in protected activity; (2) his employer knew he was engaged in the protected activity; (3) his employer took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Milman v. Feiger & Fieger, P.C.*, 58 F. 4th 860, 867 (6th Cir. 2023) (citing *Sybra, Inc.*, 667 F.3d at 761). Newcomer does not cite to the correct standard, presumably because Newcomer misconstrues Rees's claim as a claim for interference rather than retaliation. Doc. 42, PageID 847–48. But consistent with its assertions

in relation to Rees's other claims, Newcomer does not seem to dispute, for the purposes of summary judgment, that Rees is able to satisfy the first three elements. The Court will therefore focus its efforts on whether a causal connection exists here.

Although temporal proximity is insufficient to show pretext, temporal proximity is enough for Rees to prove a causal connection for purposes of a prima facie case for FMLA retaliation. The record is clear that Newcomer terminated Rees about three weeks after he used FMLA leave. Time and again, the Sixth Circuit has found that a plaintiff can establish the causality prong through close temporal proximity. *See, e.g.*, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."); *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (per curiam) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."). So the evidence proffered by Rees is sufficient "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Seeger*, 681 F.3d at 283.

That brings us to the familiar question of whether Newcomer can "articulate some legitimate, nondiscriminatory reason" for its actions. *Gribcheck*, 245 F.3d at 550. It can. Once again, Newcomer reiterates its basis for terminating Rees—that is, his termination was "based on poor performance" that "preceded any notice of or request for FMLA." Doc. 42, PageID 848. This is sufficient for Newcomer to meet its burden and shift that burden back to Rees. Rees relies on the same evidence as his disability discrimination claims to prove pretext. There

21

is no need to belabor the point in regard to that evidence because for the same reasons discussed earlier, Rees cannot establish pretext on those facts.

Rees does, however, offer additional argument pertinent to his FMLA claim that warrants due consideration. Rees claims that Hasselbeck targeted Berger for taking FMLA leave, demonstrating animosity toward employees that took such leave. Doc. 49, PageID 1191. He testified that conversations with Hasselbeck about Berger's FMLA leave "were ongoing from the day that [he] was hired till the day that [he] was terminated." Rees Dep., Doc. 34, 65:3–7. Rees thus claims that Hasselbeck's motivations are relevant to pretext because, as he alleges, Hasselbeck was involved in his termination. *Id.* Even assuming that Hasselbeck was involved in Rees's termination decision, Rees has not proven pretext.

The only evidence that supports Rees's claims about Hasselbeck's opposition to FMLA leave are his own statements, and Rees's statements are belied by other evidence of record. Hasselbeck testified that he did not recall being informed that Rees had been placed on FMLA leave or that Rees's doctor had recommended him for intermittent FMLA leave. Hasselbeck Dep., Doc. 38, 28:19–29:1. Hasselbeck also disputed Rees's claims about Berger. *Id.* at 37:22–38:10. Chalmers similarly testified that she did not recall ever discussing with Hasselbeck his animus toward Berger's FMLA leave. Chalmers Dep., Doc. 37, 71:7–10. And there is no evidence that Berger complained of treatment over her FMLA leave.[3]

These facts are essentially indistinguishable from *Parks v. UPS Supply Chain Solutions, Inc.,* 607 F. App'x 508 (6th Cir. 2015). Similar to this case, the plaintiff in *Parks* advanced a

---

[3] The only other evidence related to hostility toward Newcomer employees that used FMLA leave implicates Rees, not Hasselbeck. Barr testified that Rees "would get rather angry and express that [she] was making things difficult for him and for the rest of the team" when she took FMLA leave. Barr Dep., Doc. 33, 42:13–22. Brown testified that Barr reported concerns about Rees and his treatment of her for using FMLA leave. Brown Dep., Doc. 36, 23:2–14.

FMLA retaliation claim after being terminated within hours of giving notice of his intent to take FMLA leave. *Id.* at 517–18. To prove pretext, the plaintiff relied on evidence that purportedly showed a supervisor's hostility toward employees that used FMLA leave. But even considering the suspicious timing of his termination, the Sixth Circuit said this was not enough. As here, the plaintiff's evidence "consist[ed] of his own testimony" about his supervisor's hostility and that hostility was directed at someone other than the plaintiff more than a year before the plaintiff's termination. *Id.* at 517. Although Rees alleges here that conversations with Hasselbeck about Berger's FMLA leave spanned several years, this Court finds, as in *Parks*, that such evidence "is too remote in time to give rise to an inference that [Rees's] termination was a result of animus that could be attributed to [Newcomer]." *Id.*

Rees has not shown that his tenuous claims about Hasselbeck create a genuine dispute of material fact that Newcomer retaliated against him for using FMLA leave. Newcomer is thus entitled to summary judgment on the FMLA claim (Count V).

## IV.   CONCLUSION

For the reasons stated, the Court **GRANTS** Newcomer's Motion for Summary Judgment (Doc. 42) and **DISMISSES** this case **WITH PREJUDICE**. The Court **ORDERS** the clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

July 16, 2025

Jeffery P. Hopkins
United States District Judge

23